# SUPREME COURT OF THE STATE OF NEW YORK
## *Appellate Division, Fourth Judicial Department*

**600**
**CA 13-02032**
PRESENT: SCUDDER, P.J., CENTRA, CARNI, AND LINDLEY, JJ.

---

DIPIZIO CONSTRUCTION COMPANY, INC.,
PLAINTIFF-PETITIONER-RESPONDENT,

V                                        MEMORANDUM AND ORDER

ERIE CANAL HARBOR DEVELOPMENT CORPORATION,
DEFENDANT-RESPONDENT-APPELLANT.
(APPEAL NO. 1.)

---

PHILLIPS LYTLE LLP, BUFFALO (KENNETH A. MANNING OF COUNSEL), FOR
DEFENDANT-RESPONDENT-APPELLANT.

HISCOCK & BARCLAY, LLP, BUFFALO (MICHAEL E. FERDMAN OF COUNSEL), FOR
PLAINTIFF-PETITIONER-RESPONDENT.

---

Appeal from an order of the Supreme Court, Erie County (Timothy J. Walker, A.J.), entered November 1, 2013. The order granted the motion of plaintiff-petitioner for partial summary judgment and denied the cross motion of defendant-respondent for partial summary judgment.

It is hereby ORDERED that the order so appealed from is unanimously reversed on the law without costs, plaintiff-petitioner's motion is denied, defendant-respondent's cross motion is granted and the fourth and sixth causes of action are dismissed.

Memorandum: Plaintiff-petitioner, DiPizio Construction Company, Inc. (DiPizio), and defendant-respondent, Erie Canal Harbor Development Corporation (Erie), entered into a construction agreement (Contract) pursuant to which DiPizio was to provide construction services for a certain revitalization project. DiPizio thereafter commenced this hybrid breach of contract action and CPLR article 78 proceeding contending, inter alia, that Erie had breached the Contract and the New York State Finance Law. DiPizio thereafter moved for partial summary judgment on liability on the fourth and sixth causes of action, and Erie cross-moved for partial summary judgment dismissing those causes of action. Supreme Court granted DiPizio's motion and denied Erie's cross motion. We now reverse.

In the fourth cause of action, DiPizio contended that Erie breached the Contract when it refused to accept DiPizio's material handling plan (MHP), which sought to dispose of nonhazardous contaminated soil at a facility approved by the New York State Department of Environmental Conservation (DEC) rather than a sanitary or industrial landfill. In the sixth cause of action, DiPizio contended that Erie breached the Contract when it refused to approve DiPizio's proposal to substitute

Chester Gray granite for Virginia Mist granite.

Resolution of this appeal depends on the principles of contract interpretation. "It is well settled that a contract must be read as a whole to give effect and meaning to every term . . . Indeed, '[a] contract should be interpreted in a way [that] reconciles all [of] its provisions, if possible'" (*New York State Thruway Auth. v KTA-Tator Eng'g Servs., P.C.,* 78 AD3d 1566, 1567; *see RLI Ins. Co. v Smiedala*, 96 AD3d 1409, 1411). Therefore, "[e]ffect and meaning must be given to every term of the contract . . . , and reasonable effort must be made to harmonize all of its terms" (*Village of Hamburg v American Ref-Fuel Co. of Niagara*, 284 AD2d 85, 89, *lv denied* 97 NY2d 603; *see Matter of El-Roh Realty Corp.*, 74 AD3d 1796, 1799). It is likewise well settled that "[t]he interpretation of an unambiguous contractual provision is a function for the court . . . , and [t]he proper inquiry in determining whether a contract is ambiguous is whether the agreement on its face is reasonably susceptible of more than one interpretation . . . To be entitled to summary judgment, the moving party has the burden of establishing that its construction of the [contract] is the only construction [that] can fairly be placed thereon" (*Nancy Rose Stormer, P.C. v County of Oneida*, 66 AD3d 1449, 1450 [internal quotation marks omitted]).

We conclude that DiPizio failed to meet its burden on the motion and that Erie met its burden on the cross motion by establishing that its construction of the Contract is the only construction that can fairly be made. The "Contract Documents" included, inter alia, the Contract, the project manuals and addenda, the information to bidders and the special conditions. The provisions concerning the MHP are found in Project Manual Section 312003 Part 3.1, which deals with the identifying information that was to be included in the MHP. Pursuant to Part 3.1 (A) (7), the information contained in the MHP was to include identification of the primary and backup facilities for disposal of nonhazardous contaminated soil. That provision of the Contract states that "[t]he primary and backup facilities may be a recycling/treatment facility or a [DEC] approved lined landfill or *other facility approved by [DEC] to accept this material*" (emphasis added). Part 3.2 specifies the manner in which contaminated soil stockpiles and excavated materials are to be removed from the site. Part 3.2 (E) provides that, "[a]t a minimum, if soil testing indicates the excavation material is not hazardous, based on the known contaminants present[,] these wastes *must* be disposed of at a sanitary or industrial landfill permitted to receive such wastes" (emphasis added).

DiPizio sought to dispose of the nonhazardous contaminated soil at a DEC approved facility that was *not* a sanitary or industrial landfill. DiPizio contended that, inasmuch as Part 3.1 (A) (7) permits the use of such a facility, Erie's refusal to approve of that disposal plan constitutes a breach of the Contract. The Contract, however, also incorporated the terms of all of the information sent to bidders, including responses to requests for information (RFIs) that were sent to bidders before DiPizio executed the Contract. In one such response, Erie's project manager specifically stated that, "[f]or excess material requiring removal from site[,] . . . 'these wastes *must* be disposed of at a sanitary or industrial landfill permitted to receive such wastes'" (emphasis added). Moreover, in response to two different RFIs made by DiPizio before DiPizio

executed the Contract, Erie's project manager clearly and unambiguously stated that any plan to use DEC approved facilities in lieu of landfills was in violation of Section 312003 Part 3.2 (E) and was "not consistent with the project requirements."

To the extent that DiPizio and the court relied upon an internal letter between Erie's project manager and Erie recognizing that the reason for DiPizio's low bid was its desire to seek an acceptable DEC alternative to the landfill, we conclude that the document was not part of the Contract Documents and is thus extrinsic evidence that we may not consider where, as here, the Contract is not ambiguous (*see South Rd. Assoc., LLC v International Bus Machs. Corp.*, 4 NY3d 272, 278).  It is well settled that " 'extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face' " (*id.*).

Although Section 312003 Part 3.1 (A) (7) at first glance seems to permit use of a DEC approved facility in lieu of a landfill, upon closer inspection it is clear that the section concerns only the identification information that must be included in the MHP.  The section concerning the actual disposal of nonhazardous contaminated soil and the responses to the RFIs, as incorporated into the Contract, contain specific mandatory provisions requiring that such material be disposed of at a sanitary or industrial landfill.  " '[W]here two seemingly conflicting contract provisions reasonably can be reconciled, a court is required to do so and to give both effect' " (*Burgdorf v Kasper*, 83 AD3d 1553, 1555).  Moreover, "it is a well-established principle of contract interpretation that specific provisions concerning an issue are controlling over general provisions" (*Huen N.Y., Inc. v Board of Educ. Clinton Cent. Sch. Dist.*, 67 AD3d 1337, 1338; *see generally Muzak Corp. v Hotel Taft Corp.*, 1 NY2d 42, 46).  Relying on those fundamental rules of contract interpretation, we conclude that the Contract clearly and unambiguously requires nonhazardous contaminated soil to be disposed of at a sanitary or industrial landfill.

Inasmuch as Erie "establish[ed] that its construction of the [Contract] is the only construction [that] can fairly be placed thereon" (*Nancy Rose Stormer, P.C.*, 66 AD3d at 1450 [internal quotation marks omitted]), Erie is entitled to partial summary judgment dismissing the fourth cause of action.

With respect to the sixth cause of action, concerning DiPizio's attempt to substitute Chester Gray granite for Virginia Mist granite, we again conclude that DiPizio failed to meet its burden on the motion and that Erie, in support of its cross motion, established its entitlement to partial summary judgment dismissing that cause of action.  Project Manual Section 044310 Part 2.2 discusses the Contract requirements for granite.  Part 2.2 (A) states that the material must comply with "ASTM C 615," and Part 2.2 (B) lists the material specifications to which all granite must conform.  Part 2.2 (D), however, provides that "Type A Granite *shall be* Virginia Mist granite . . . *or approved equal* . . . [and] Type B Granite shall be Cambrian Black granite . . . or approved equal" (emphasis added).  Project Manual Section 016000 Part 2.1 (A) (6) further provides that, "[f]or products specified by name and accompanied by the term .

. . 'or approved equal,' " the proposed substitute product must comply with the " 'Comparable Products' Article to obtain approval for use."  A Comparable Product is defined in Section 016000 Part 1.3 (A) (3) as a "[p]roduct that is demonstrated and approved through submittal process to have the indicated qualities related to type, function, dimension, in-service performance, *physical properties*, appearance, and other characteristics that equal or exceed those of [the] specified product" (emphasis added).  Section 8 (D) of the Special Conditions, which are part of the Contract Documents, clearly states that "[t]he Architect's/Engineer's decision on substitutions and/or equivalencies shall be final and is not subject to dispute by" DiPizio.

DiPizio contends that the "approved equal" requirement in Section 044310 Part 2.2 (D) applies only to approval of the aesthetic properties of the granite because, otherwise, the material specification requirements of Part 2.2 (A) and (B) would be rendered superfluous.  Erie contends that the material requirements of Section 044310 Part 2.2 (A) and (B) are merely the minimum requirements for any granite to be used on the Project and apply to both Type A and Type B granite.  According to Erie, Part 2.2 (A) and (B) are not rendered superfluous by the "approved equal" requirements of Part 2.2 (D) inasmuch as the material specification requirements of Part 2.2 (A) and (B) apply to other types of granite used on the site.  Erie thus contends that the "approved equal" requirements for Type A granite apply to all of the qualities of the named granite, including the physical properties.

There is no dispute that Chester Gray granite complies with the material requirements outlined in Part 2.2 (A) and (B) and that the architect ultimately approved the aesthetic properties of the Chester Gray granite.  There is also no dispute that Erie's architect determined that the physical properties of Chester Gray granite were inferior to that of Virginia Mist granite and rejected the substitution on that ground.

In our view, the Contract clearly and unambiguously requires that the proposed substitute for Virginia Mist granite must have the indicated qualities related to, inter alia, physical properties "that equal or exceed those of" Virginia Mist granite.  Erie established that the physical properties of Chester Gray granite did not equal or exceed those of Virginia Mist granite and, therefore, Erie had the discretion to deny approval of the proposed substitution.  Inasmuch as the decision of Erie's architect with respect to substitutions is final, we conclude that Erie is entitled to partial summary judgment

dismissing that cause of action.

Entered:  August 8, 2014

Frances E. Cafarell
Clerk of the Court